PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

v.

RICHARD THOMAS STITT, a/k/a Patrick
V. Hardy, a/k/a Tom Tom,
          *Defendant-Appellant.*

No. 99-2

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Raymond A. Jackson, District Judge.
(CR-98-47)

Argued: October 30, 2000

Decided: May 25, 2001

Before WIDENER, WILLIAMS, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Williams wrote the opinion, in
which Judge Widener and Judge Motz joined.

## COUNSEL

**ARGUED:** Gerald Thomas Zerkin, GERALD T. ZERKIN & ASSO-
CIATES, Richmond, Virginia, for Appellant. Fernando Groene,
Assistant United States Attorney, Darryl James Mitchell, Assistant
United States Attorney, Norfolk, Virginia, for Appellee. **ON BRIEF:**
Melanie H. Moore, GERALD T. ZERKIN & ASSOCIATES, Rich-
mond, Virginia, for Appellant. Helen F. Fahey, United States Attor-
ney, Norfolk, Virginia, for Appellee.

**OPINION**

WILLIAMS, Circuit Judge:

Richard Thomas Stitt was convicted in the United States District Court for the Eastern District of Virginia on numerous federal drug and firearms-related charges, including three counts of murder during a continuing criminal enterprise (CCE) relating to a large drug distribution ring he led in Virginia and North Carolina. Following his jury conviction and the jury's recommendation, after a penalty phase hearing, that a sentence of death be imposed, the district court sentenced Stitt to death plus 780 months in prison.[1] On direct appeal, Stitt challenges his convictions and sentences on multiple grounds. Stitt argues that the district court committed plain error when it did not instruct the jury that it had to be unanimous as to which three violations of Title 21 constituted the series of transactions that made up the CCE and as to which five persons Stitt managed or supervised during the CCE, that the district court abused its discretion in admitting certain evidence relating to circumstances surrounding a traffic stop, that Stitt was entitled to a jury instruction and to a mitigating factor that unequivocally informed the jury that he would be sentenced to life in prison without the possibility of parole or release if he was not sentenced to death, that the district court committed reversible error by giving confusing instructions to the jury, that the district court abused its discretion by permitting the United States to introduce victim impact testimony in rebuttal during the penalty hearing after Stitt introduced mitigating evidence, and that the Government's use of the

---

[1]Stitt was sentenced to death for each of the three murders during a CCE, to life for the CCE conviction, to life for murder with a firearm during a drug trafficking crime, to twenty years for each of the three counts of possession with intent to distribute cocaine base, and to ten years for being a felon in possession of a firearm. All of these sentences were to be served concurrently. Stitt was also sentenced to sixty months for one count of using and carrying a firearm during and in relation to a crime of violence, to 240 months for the other count of using and carrying a firearm during and in relation to a crime of violence, and to 240 months on both of the counts of using and carrying a firearm during and in relation to a drug trafficking crime. These sentences were to be served consecutively for a total of 780 months.

testimony of cooperating witnesses violated 18 U.S.C.A. § 201(c)(2) (West 2000) because witnesses were promised benefits in exchange for their testimony. Finding no reversible error, we affirm.

I.

On April 14, 1998, a federal grand jury in Norfolk, Virginia indicted Stitt and twelve other defendants in a thirty-one count indictment that charged them with numerous violations of federal narcotics and firearms laws and drug-related murders. A two-month long jury trial against Stitt and co-defendants Kermit Brown, Robert Mann, and Percell Davis[2] began on September 8, 1998 in the Eastern District of Virginia, Norfolk Division. At trial, the Government introduced evidence that Stitt was the leader of a CCE that distributed in excess of 150 kilograms of crack cocaine in the Portsmouth, Virginia area and in Raleigh, North Carolina from late 1990 through April 1998. The Government's evidence also showed that Stitt ordered the three homicides with which he was charged to further the aims of the CCE. The jury returned guilty verdicts against all four defendants.[3]

---

[2]Brown, Mann, and Davis were all charged, along with Stitt, with conspiracy in Count I of the Superceding Indictment. Additionally, Mann was charged with "substantive counts of possession with intent to distribute cocaine base . . . and distribution of cocaine base"; Davis was charged with "possession with intent to distribute cocaine base . . . distribution of cocaine base . . . and murder"; and "Brown was charged with several counts, including . . . murder in furtherance of a criminal enterprise, use of a firearm during a crime of violence, and substantive drug offenses." *United States v. Brown*, No. 99-4062(L), 2000 WL 930786, at *1 (4th Cir. July 10, 2000) (unpublished) (internal citations omitted).

[3]Specifically, Stitt was found guilty of conspiracy to distribute and possession with intent to distribute cocaine base pursuant to 21 U.S.C.A. § 846 (West 1999 & Supp. 2000); engaging in a CCE under 21 U.S.C.A. § 848(a) and (c) (West 1999 & Supp. 2000); three counts of murder during a CCE under 21 U.S.C.A. § 848(e)(1)(A) (West 1999 & Supp. 2000) and 18 U.S.C.A. § 2 (West 2000); two counts of using and carrying a firearm during and in relation to a crime of violence and two counts of using and carrying a firearm during and in relation to a drug trafficking crime, all under 18 U.S.C.A. § 924(c) (West 2000) and 18 U.S.C.A. § 2 (West 2000); murder with a firearm during a drug trafficking crime

Thereafter, pursuant to 21 U.S.C.A. § 848(g), a penalty phase hearing began during which Stitt and the Government presented to the jury information relevant to the aggravating and mitigating factors as to the three murder convictions that occurred during the CCE. After hearing testimony for five days and deliberating for three days, the jury unanimously recommended that Stitt be sentenced to death on each of the three counts of murder during a CCE. Following the jury's recommendation, the district court sentenced Stitt to death on each of his three convictions for murder during a CCE. In addition, Stitt was sentenced to a total of 780 months to be served consecutively for his two convictions of using and carrying a firearm during and in relation to a crime of violence and for his two convictions of using and carrying a firearm during and in relation to a drug trafficking crime. We now address Stitt's assignments of error, first as to his conviction and then as to his sentence. (R. 100.)

## II. *THE* RICHARDSON *ERROR*

Relying upon the Supreme Court's decision in *Richardson v. United States*, 526 U.S. 813 (1999), Stitt claims that the district court committed plain error when it did not instruct the jury that it had to be unanimous as to which three violations of Title 21 constituted the series of transactions that made up the CCE and as to which five persons Stitt managed or supervised during the CCE.

---

under 18 U.S.C.A. § 924(i) (West 2000) and 18 U.S.C.A. § 2; being a felon in possession of a firearm under 18 U.S.C.A. § 922(g)(1) (West 2000) and 18 U.S.C.A. § 2; and three counts of possession with intent to distribute cocaine base under 21 U.S.C.A. § 841(a)(1) (West 2000) and 18 U.S.C.A. § 2. The conspiracy conviction was vacated on the Government's motion because it was a lesser included offense of the CCE.

Mann was found "guilty of conspiracy, possession with intent to distribute cocaine base, and distribution of cocaine base." *United States v. Brown*, No. 99-4062(L), 2000 WL 930786, at *3 (4th Cir. July 10, 2000) (unpublished). Davis was acquitted of murder, but found "guilty of conspiracy, possession with intent to distribute cocaine base, and distribution of cocaine base." *Id.* Brown was convicted "on all four counts with which he was charged." *Id.* This Court affirmed their convictions and sentences. *Id.* at *1.

A.

After Stitt was convicted and sentenced, the Supreme Court held in *Richardson* that, in a prosecution for engaging in a CCE under 21 U.S.C.A. § 848, the jury "must agree unanimously about which three crimes the defendant committed," *Richardson*, 526 U.S. at 818, to satisfy the statutory requirement that the defendant's behavior is "part of a continuing series of violations" described in 21 U.S.C.A. § 848(c)(2). Because Stitt did not object to the jury instructions before the district court, we review those instructions for plain error. *See United States v. Rogers*, 18 F.3d 265, 268 (4th Cir. 1994) (stating standard of review where defendant fails to object at trial).

To establish plain error under Federal Rule Criminal Procedure 52(b), Stitt must show (1) that an error occurred; (2) that the error was plain; and (3) that the error affected his substantial rights. *United States v. Olano*, 507 U.S. 725, 732 (1993). "Rule 52(b) is permissive, not mandatory." *Id.* at 735. Even where the first three requirements of plain error are met, the decision to correct the error is left to the discretion of the court of appeals "and the court should not exercise that discretion unless the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732 (internal quotation marks omitted).

In this case, the first element of the *Olano* test — that there be error — is met because the trial court, in compliance with then-existing Fourth Circuit precedent, failed to instruct the jury on the unanimity requirement of 21 U.S.C.A. § 848. *See United States v. Hall*, 93 F.3d 126, 129-30 (4th Cir. 1996) (holding that under the plain meaning of § 848, "as long as each juror is satisfied in his or her own mind that the defendant committed acts constituting the series, the requisite jury unanimity exists"). Likewise, the error was plain. As the Supreme Court noted in *Johnson v. United States*, 520 U.S. 461 (1997), "where the law at the time of trial was settled and clearly contrary to the law at the time of appeal — it is enough that an error be plain at the time of appellate consideration." *Id.* at 468 (internal quotation marks omitted); *see also United States v. Richardson* ("*Nathaniel Richardson*"), 233 F.3d 223, 228 (4th Cir. 2000) (noting that an error is plain when the action is contrary to the law at the time of appeal).

Although the first two *Olano* elements have been met, Stitt cannot satisfy the third element — that the error affect substantial rights. The requirement that the error affect substantial rights "typically means that the defendant is prejudiced by the error in that it affected the outcome of the proceedings." *United States v. Rolle*, 204 F.3d 133, 138 (4th Cir. 2000) (internal quotation marks omitted). When reviewing for plain error, this Circuit incorporates the harmless error test in the third prong of its plain-error analysis but shifts the burden of proof to the defendant to prove that the error was not harmless. *See United States v. Hastings*, 134 F.3d 235, 240 (4th Cir. 1998); *see also United States v. Floresca*, 38 F.3d 706, 713 (4th Cir. 1994) (en banc) ("Rule 52(a) squarely defines harmless error as error that does *not* affect substantial rights."). Although Stitt argues that the district court's failure to instruct the jury on the unanimity requirement constitutes structural error and, thus, is not subject to harmless error analysis, we disagree. Indeed, this issue has already been settled in this Circuit. We recently joined our "sister circuits in holding that a *Richardson* error is not a structural defect; rather . . . it is subject to harmless error analysis." *United States v. Brown*, 202 F.3d 691, 699 (4th Cir. 2000); *see also Nathaniel Richardson*, 233 F.3d at 228 (citing *Brown* for the conclusion that "*Richardson* errors which have been preceded by objection at trial are subject to harmless error analysis").

Because Stitt did not object to the district court's failure to instruct the jury that it had to be unanimous as to which three violations of Title 21 constituted the series of transactions that made up the CCE, "we cannot simply review to determine whether the instructional error was harmless beyond a reasonable doubt." *Hastings*, 134 F.3d at 243. Under plain-error review, it is not enough for Stitt "to establish that it is impossible to tell whether the verdict returned by the jury rested solely on the misinstruction, for such a showing would establish only that the error was not harmless." *Id.* Rather, in order to establish the actual prejudice required by the third prong of plain-error review, [Stitt] must demonstrate that the erroneous [ ] instruction given by the district court resulted in his conviction." *Id.* at 244. Stitt was convicted of three counts of possession with intent to distribute cocaine base and three counts of murder during a CCE, all of which the Government argued were offenses constituting "the continuing series of violations" making up the CCE. These six offenses, under 21

U.S.C.A. 841(a)(1)[4] and 21 U.S.C.A. 848(e)(1)(A)[5] respectively,

---

[4]Count two of the Superceding Indictment which charges Stitt with engaging in a CCE reads:

THE GRAND JURY FURTHER CHARGES THAT:

From at least late 1990, and continuously thereafter up to and including the date of the filing of this indictment, in the Eastern District of Virginia and elsewhere, the defendant RICHARD THOMAS STITT, unlawfully, intentionally, and knowingly, did engage in a continuing criminal enterprise, that is, he did knowingly and intentionally violate Title 21, United States Code, Sections 841 and 846, including, but not limited to, those violations alleged in the instant indictment, which are realleged and incorporated by reference herein, and did commit other violations of said statutes, which violations were part of a continuing series of violations of said statutes undertaken by RICHARD THOMAS STITT in concert with at least five other persons with respect to whom he occupied positions of organizer, a supervisory position and any other position of management, and from which continuing series of violations the defendant RICHARD THOMAS STITT obtained substantial income and resources.

(In violation of Title 21, United States Code, Section 848 (a) and (c).)

(J.A. 89.)

The three counts of possession with intent to distribute cocaine base under 21 U.S.C.A. § 841(a)(1), which were charged as counts 18, 19, and 23 in the indictment, are clearly "violations alleged in the instant indictment" and thus are "related violations . . . alleged to be predicate violations constituting the continuing series." *See United States v. Brown*, 202 F.3d 691, 699 (4th Cir. 2000).

[5]*See United States v. Tipton*, 90 F.3d 861, 884 (4th Cir. 1996) (holding that it is not error to instruct "the jury that it might consider any murder-in-furtherance violations found under § 848(e) among the predicate violations required to convict on the CCE Count"). In this case, each of the three murder-during-a-CCE counts (counts 3, 5, & 7) state that Stitt [and specified co-defendants]

while engaged in and working in furtherance of a Continuing Criminal Enterprise as defined by Title 21, United States Code, Section 848(c), as charged in Count Two of this indictment, which is realleged and incorporated herein . . . did knowingly,

clearly fall within subchapter I of Title 21 and are therefore the type of violations that "can constitute predicate offenses in the 'continuing series.'" *Id.* Thus, the jury's decision to convict establishes that Stitt was unanimously found guilty of at least three predicate violations constituting the continuing series. *See Brown*, 202 F.3d at 700. Under such circumstances, Stitt cannot demonstrate that the erroneous instruction given by the district court led to his CCE conviction. As a result, Stitt's substantial rights were not affected. Thus, the third element of *Olano* is not met.

Finally, assuming arguendo that the first three *Olano* elements were met, the error in this case does not meet the final requirement of the *Olano* test — that the error "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. "[A] plain error affecting substantial rights does not, without more, satisfy [this standard], for otherwise the discretion afforded by Rule 52(b) would be illusory." *Id.* at 737. Any error, however, "may seriously affect the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id.* at 736-37 (internal citations and quotations omitted).

Here, Stitt was found guilty beyond a reasonable doubt of three counts of possession with intent to distribute cocaine base and three counts of murder during a CCE. Numerous witnesses testified that Stitt was the organizer and supervisor of a large drug conspiracy, that he engaged in numerous transactions involving substantial quantities

---

intentionally, and unlawfully kill and counsel, command, induce, procure, and cause the intentional killing [of each of the three victims] and did aid, abet, and assist one another and others in the commission of said offense.

(J.A. at 90, 93-4, 96-7.) Thus, each of these three murders specifically was found to have occurred in furtherance of, and while engaged in, "the continuing series of violations" making up the CCE. Any three of the total of six predicate offenses for which Stitt was convicted (the three counts of possession with intent to distribute cocaine base and the three murders in furtherance of a CCE) are sufficient to constitute the "three related drug violations" necessary to satisfy the requirements of *Brown*. *United States v. Brown*, 202 F.3d 691, 699-700 (4th Cir. 2000).

of drugs, and that he ordered three men murdered to advance his criminal enterprise. Based upon these counts for which Stitt was charged and convicted, "we conclude . . . that the fairness, integrity or public reputation of the judicial proceedings in this case are not seriously affected by the affirmance of the judgment of conviction and that the conviction should not be set aside merely because the jury was not instructed to isolate three violations among the [many] before it." *Nathaniel Richardson*, 233 F.3d at 230.[6] As a result, we have no difficulty concluding that Stitt has not established plain error.

B.

Stitt also claims that the district court erred by not requiring the jury to unanimously determine which five persons Stitt managed or supervised.[7] In *Richardson*, the Supreme Court assumed, without

---

[6]Stitt relies upon *United States v. Tipton*, 90 F.3d 861, 887 & n.13 (4th Cir. 1996), for the proposition that "[a]s to the murder counts, the Government was required to prove that the homicides were directly connected to the underlying CCE" and that "[a] mere temporal connection is insufficient." (Appellant's Br. at 15.) *Tipton* merely notes that a "substantive connection must be implied as an essential element of § 848(e)." *Tipton*, 90 F.3d at 887 n.13. Here, as in *Tipton*, the "Government's evidence expressly linked each" of the three CCE murders for which Stitt was convicted "to a furtherance of the CCE's purposes: either silencing potential informants or witnesses" or settling a drug-related dispute. *Id.* at 887. Because the Government's evidence showed that the murders were substantively connected to the CCE, the requirements of *Tipton* are satisfied.

[7]Overwhelming evidence was presented at trial from which the jury could have concluded that Stitt acted in concert with five or more persons whom he supervised, organized, or managed in furtherance of the CCE. For example, co-defendants Marcus Reid, Jason Ortega, Jason Davis, Ivan Harris, Teo Smith, and Angela Signal testified that Stitt directed them, as well as co-defendants Kermit Brown and Percell Davis, to commit acts in furtherance of Stitt's organization. Reid testified that he and many others, including persons known as Little Dread, K-9, Sadat, Heavy, Two Pound, Dawn, Little Tank, Little D, and Poochie, worked for Stitt selling, couriering, and distributing drugs. Reid also testified about numerous crimes of violence in which he, Stitt, and other members of the Stitt organization were involved. Ortega testified that he

deciding, "that there is no unanimity requirement in respect to" 21 U.S.C.A. § 848(c)(2)(A), the statutory requirement "which requires a defendant to have supervised 'five or more other persons.'" *Richardson*, 526 U.S. at 824 (quoting 21 U.S.C.A. § 848(c)(2)(A)). The Court noted that the "five or more person" provision is "significantly different . . . in respect to language, breadth, tradition, and other factors" from the provision requiring unanimity as to which three crimes the defendant committed. *Id.* at 824. Justice Kennedy noted in his dissent in *Richardson* that, "[w]ith respect to the requirement of action in concert with five or more other persons, every Court of Appeals to have considered the issue has concluded that the element aims the statute at enterprises of a certain size, so the identity of the individual supervisees is irrelevant." *Richardson*, 526 U.S. at 829 (Kennedy, J., dissenting); *United States v. Harris*, 209 F.3d 156, 160 (2d Cir. 2000); *United States v. Garcia*, 988 F.2d 965, 969 (9th Cir. 1993); *United States v. Harris*, 959 F.2d 246, 255 (D.C. Cir. 1992); *United States v. Moorman*, 944 F.2d 801, 803 (11th Cir. 1991); *United States v. English*, 925 F.2d 154, 159 (6th Cir. 1991); *United States v. Linn*, 889 F.2d 1369, 1374 (5th Cir. 1989); *United States v. Jackson*, 879 F.2d 85, 88 (3d Cir. 1989); *United States v. Tarvers*, 833 F.2d 1068, 1074-75 (1st Cir. 1987); *United States v. Markowski*, 772 F.2d 358, 364 (7th Cir. 1985). We agree that the identity of the individual supervisees is irrelevant.

As long as the jurors unanimously conclude that the Government has proven the other required elements and that the defendant orga-

---

worked "as a hit man, drug courier, drug organizer, distributor, [and] basically anything and everything possible to keep the drug organization running smoothly" in the organization which Stitt "headed." (TT at 1621.) Ortega also testified that he killed James Gilliam on Stitt's orders. Davis testified that he sold and redistributed crack for Stitt and acted as Stitt's enforcer and bodyguard. Davis also testified that he killed Sinclair Simon after being ordered to do so by Stitt. Harris testified that he sold drugs and served as a protector for Stitt. On two occasions Stitt asked Harris to kill someone. Harris could not carry out the first request because he was incarcerated, and he refused to kill the second man. Teo Smith testified that he sold drugs for Stitt in North Carolina and Virginia. Angela Signal testified that she rented vehicles for Stitt. Stitt used these vehicles in his criminal activities.

nized, supervised, or managed five or more persons, we hold that the jury need not unanimously agree on which five persons were organized, supervised, or managed by the defendant.[8] *Richardson*, 526 U.S. at 817; *see Harris*, 209 F.3d at 160 (noting, in the context of a challenge to a guilty plea, that "even at trial, the government need not prove the identities of the five persons supervised in order to establish that element of a continuing criminal enterprise"). In this regard, § 848 "tracks the law of conspiracy, which generally has not required jurors to identify the defendant's co-conspirators." *Harris*, 959 F.2d at 256; *see also Rogers v. United States*, 340 U.S. 367, 375 (1951) ("Of course, at least two persons are required to constitute a conspiracy, but the identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown.").

Precise details, like the identities of the underlings supervised by the defendant, are not essential elements of the CCE but rather "merely historical facts as to which the jurors could have disagreed without undermining their substantial agreement as to the ultimate and essential fact of whether the requisite size and level of control existed." *Jackson*, 879 F.2d at 89. "'[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" *Schad v. Arizona*, 501 U.S. 624, 631-32 (1991) (quoting

---

[8]In *Richardson*, the Supreme Court noted that

> a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime. Where, for example, an element of robbery is force or the threat of force, some jurors might conclude that the defendant used a knife to create the threat; others might conclude he used a gun. But that disagreement — a disagreement about means — would not matter as long as all 12 jurors unanimously concluded that the Government had proved the necessary related element, namely that the defendant had threatened force.

*Richardson v. United States*, 526 U.S. 813, 817 (1999) (internal citations and quotation marks omitted).

*McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring)); *Jackson*, 879 F.2d at 88 ("We have never required that jurors be in complete agreement as to the collateral or underlying facts which relate to the manner in which the culpable conduct was undertaken."). Accordingly, we conclude that the district court did not err by failing to give an instruction requiring that the jury agree unanimously on which five underlings Stitt managed, organized, or supervised.

## III. *THE TRAFFIC STOP*

Stitt next argues that the district court erred in admitting evidence of a 1991 traffic stop in which Stitt allegedly was involved. At trial, the Government introduced evidence, over Stitt's objection, that Stitt was a passenger in a car along with two other people on June 21, 1991, when the police stopped the car, searched it, and recovered guns, bullets, and crack cocaine.[9] Lieutenant King of the Portsmouth Police Department testified that Stitt, who was not in physical possession of a weapon or drugs, initially identified himself as "Mike Jones" and also gave King a false address and date of birth. King determined Stitt's true identity later that day after the address that "Mike Jones" gave turned out to be nonexistent, and he learned that the date of birth that "Mike Jones" gave was also incorrect. After determining Stitt's correct identity and that he was seventeen years old, King reprocessed Stitt as a juvenile. The charges stemming from the incident brought against Stitt were later dismissed. Not surprisingly, at the trial in this case, neither King nor another officer, who also was present at the scene of the traffic stop, was able to identify Stitt in the courtroom over seven years after the incident.

Stitt claims that this evidence should have been excluded under Federal Rule of Evidence 404(b) which makes "[e]vidence of other crimes, wrongs, or acts [inadmissible] to prove the character of a person in order to show conformity therewith." The Government argues

---

[9]The traffic stop occurred during the time frame and in the locale of the conspiracy. According to the Superceding Indictment, the conspiracy lasted "[f]rom on or about 1990 . . . and continuously thereafter up to and including" April 14, 1998, the date the indictment was returned. (J.A. at 42.)

that the evidence was intrinsic evidence admissible without regard to Rule 404(b). We agree.

"Decisions regarding the admission or exclusion of evidence are committed to the sound discretion of the district court and will not be reversed absent an abuse of that discretion." *United States v. Lancaster*, 96 F.3d 734, 744 (4th Cir. 1996) (en banc). "[W]here testimony is admitted as to acts intrinsic to the crime charged, and is not admitted solely to demonstrate bad character, it is admissible." *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996). Evidence of uncharged conduct is not considered evidence of other crimes where "it is necessary to complete the story of the crime (on) trial." *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (internal citations and quotation marks omitted). "[A] conspiracy may be proved wholly by circumstantial evidence." *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc). In fact, a common purpose and plan "may be inferred from a 'development and collocation of circumstances.'" *Id.* (quoting *Glasser v. United States*, 315 U.S. 60, 80 (1942)). Such circumstantial evidence used to support a conspiracy may include the defendant's "'relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy.'" *Burgos*, 94 F.3d at 858 (quoting *United States v. Collazo*, 732 F.2d 1200, 1205 (4th Cir. 1984)).

In this case, as the Government contends, evidence concerning the 1991 traffic stop is intrinsic to the conspiracy to distribute, and possession with intent to distribute, cocaine base charged in Count 1 of the Indictment. In addition to King's testimony, a cooperating witness, Marcus Reid, testified at trial that Stitt frequently used the alias "Mike Jones." Therefore, King's testimony, to the extent the jury found it credible, bolstered the Government's evidence that Stitt frequently used aliases, including the alias "Mike Jones," throughout the life of the conspiracy and constituted circumstantial proof of Stitt's membership in the conspiracy. Furthermore, King's testimony placed Stitt in a rental vehicle in the presence of guns and drugs, all integral components of the conspiracy with which Stitt was charged. *See Chin*, 83 F.3d at 88 (upholding the admission of testimony without regard to Rule 404(b) where the testimony concerned an "integral" component of, and was "inextricably intertwined" with, the ongoing criminal

enterprise). Accordingly, the district court did not abuse its discretion in admitting this evidence.

### IV. *THE LIFE-WITHOUT-PAROLE INSTRUCTION AND MITIGATING FACTOR*

We next address Stitt's argument that at the penalty phase, the Fifth and Eighth Amendments to the Constitution entitled him to a jury instruction and to a mitigating factor that unequivocally informed the jury that he would be sentenced to life in prison without the possibility of parole or release if he were not sentenced to death. We review allegations of a constitutionally defective jury instruction de novo. *See United States v. Morrison*, 991 F.2d 112, 115 (4th Cir. 1993) ("Whether jury instructions were properly given is a question of law . . . .").

### A.

Stitt claims that he was entitled under the Eighth Amendment to a jury instruction and mitigating factor informing the jury that he would be sentenced to life in prison without parole if he was not sentenced to death. Specifically, Stitt relies upon Justice Souter's concurring opinion in *Simmons v. South Carolina*, 512 U.S. 154 (1994), for the proposition that a defendant is entitled under the Eighth Amendment "to have his jury instructed as to the meaning of sentencing considerations and alternatives." (Appellant's Br. 36); *see also Simmons*, 512 U.S. at 172 (Souter, J., concurring) (noting that he would hold that the Eighth Amendment, in addition to the Fifth Amendment, requires a jury to be informed that a defendant is parole ineligible when future dangerousness is at issue). Neither the Supreme Court nor this Circuit, however, has held that the Eighth Amendment is applicable where the Government alleges future dangerousness but it is unlikely that the defendant will ever be released on parole, and we decline to do so in this case. *See, e.g.*, *Simmons*, 512 U.S. at 162 n.4 ("We express no opinion on the question whether the result we reach today is also compelled by the Eighth Amendment."); *Wilson v. Greene*, 155 F.3d 396, 407 (4th Cir. 1998) ("*Simmons* did not address whether the Eighth Amendment required an instruction on parole ineligibility."). Instead, both this Court and the Supreme Court have addressed the

issue of when an instruction on parole ineligibility is required under the Due Process Clause of the Fifth Amendment.

B.

Stitt also relies upon *Simmons* for his Fifth Amendment argument that "where the defendant's future dangerousness is at issue, and [the relevant] law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." *Id.* at 156.[10] Stitt further argues that the jury that sentenced him should have been informed that he was parole ineligible because the Government identified future dangerousness within and without the prison setting as non-statutory aggravating factors in its Amended Notice of Intent to Seek a Sentence of Death.

*Simmons* has been narrowly construed, both by the Supreme Court and this Court. *See, e.g.*, *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000) (refusing to accept Ramdass's argument that the Court should "ignore the legal rules dictating his parole eligibility under state law in favor of . . . a functional approach, under which . . . a court evaluates whether it looks like the defendant will turn out to be parole ineligible"); *O'Dell v. Netherland*, 95 F.3d 1214, 1223 (4th Cir. 1996) (en banc) (recognizing that this Court reads *Simmons* narrowly); *Bacon v. Lee*, 225 F.3d 470, 486 (4th Cir. 2000) (noting that this Court has consistently refused to extend *Simmons*). This past term, the Supreme Court, in a plurality opinion, noted that "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison." *Ramdass*,

---

[10]In analyzing whether a *Simmons* instruction is required in a particular case, a court must take into account the particular characteristics of the sentencing scheme at issue. *See, e.g.*, *Simmons*, 512 U.S. 154, 156 (1994) (evaluating the constitutionality of a South Carolina sentencing scheme and finding that an instruction on parole ineligibility was required); *Ramdass v. Angelone*, 530 U.S. 156, 177 (2000) (considering a Virginia sentencing scheme and holding that a *Simmons* instruction was not required); *Shafer v. South Carolina*, 121 S.Ct. 1263, 1265 (2001) (evaluating a South Carolina statutory sentencing scheme enacted after the decision in *Simmons* and determining that a *Simmons* instruction was required).

120 S.Ct. at 2121 (plurality opinion of Kennedy, J.). Justice O'Connor pointed out in her opinion concurring in judgment that

> [w]here all that stands between a defendant and parole ineligibility under state law is a purely ministerial act, *Simmons* entitles the defendant to inform the jury of that ineligibility, either by argument or instruction, even if he is not technically "parole ineligible" at the moment of sentencing.[11]

*Ramdass*, 120 S.Ct. at 2127 (O'Connor, J., concurring).

Stitt argues that his case falls within the parameters of *Simmons* because once the jury found that he intentionally killed the three victims or caused them to be killed, no downward departure was legally or practically possible under the Sentencing Guidelines, and he certainly would have been sentenced to life in prison without parole if he had not been sentenced to death. We disagree.

Because the Government pursued the death penalty in this case, a separate penalty phase hearing was held before the jury that convicted Stitt. *See* 21 U.S.C.A. § 848(g) ("A person shall be subjected to the penalty of death for any offense under this section only if a hearing is held in accordance with this section."). Under § 848(e), if, after the penalty phase hearing, the jury had not recommended that Stitt receive a death sentence, the district court would have been required to sentence Stitt "to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment." 21 U.S.C.A. § 848(e)(1)(A); *see* 21 U.S.C.A. §§ 848(k) & (l) (recognizing the court's authority in certain situations to "impose a sentence, other than death, authorized by law"); § 848(p) (stating that "[i]f a

---

[11]Although Justice Kennedy wrote the plurality opinion in which Chief Justice Rehnquist and Justices Scalia and Thomas joined, Justice O'Connor's concurring opinion is the decisive one in *Ramdass*. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds . . . .'" *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)).

person is convicted for an offense under subsection (e) of this section and the court does not impose the penalty of death, the court *may* impose a sentence of life imprisonment without the possibility of parole") (emphasis added). Although, as Stitt points out, the district court then would have had to follow the Sentencing Guidelines in arriving at the proper sentence which, in this case, would likely have been life imprisonment for each of the three murders in furtherance of the CCE under United States Sentencing Guidelines Manual § 2A1.1 (1998),[12] "the Guidelines also allow the district court to depart from the assigned offense levels and impose a lesser sentence." *United States v. Flores*, 63 F.3d 1342, 1368 (5th Cir. 1995) (analyzing whether *Simmons* requires a parole ineligibility instruction in a § 848 death penalty case); *see, e.g.*, U.S.S.G. § 5K2.0, p.s. (noting that under 18 U.S.C.A. § 3553(b) (West 2000), the sentencing court may sentence the defendant "outside the range established by the applicable guidelines, if the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described") (internal quotation marks omitted).

We do not read the statement in U.S.S.G. § 2A1.1 application note 1 that "[t]he [Sentencing Guidelines] Commission has concluded that in the absence of capital punishment, life imprisonment is the appropriate punishment for premeditated killing," to preclude unequivocally a downward departure by the district court in all cases involving an intentional killing. Both the Supreme Court and this Court have held that the Guidelines do "not eliminate all of the district court's discretion" in sentencing. *Koon v. United States*, 518 U.S. 81, 92 (1996); *United States v. DeBeir*, 186 F.3d 561, 565-66 (4th Cir. 1999). U.S.S.G. ch. 5, pt. K "lists factors that the Commission believes may constitute grounds for departure." U.S.S.G. ch. 1, pt. A, intro. comment 4(b), at 7. However, the Commission recognizes that this "list is not exhaustive" and "that there may be other grounds for departure that are not mentioned." *Id.* Therefore, in extraordinary

---

[12]The base offense level for first degree murder under U.S.S.G. § 2A1.1 is 43. U.S. Sentencing Guidelines Manual § 2A1.1 (1998). An offense level of 43 translates into a life sentence. U.S.S.G. Chap. 5, pt. A.

cases, a sentencing court may depart from the designated sentencing range if "'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Koon*, 518 U.S. at 92 (quoting 18 U.S.C.A. § 3553(b)); *DeBeir*, 186 F.3d at 566 (same). Finally, the possibility exists that, "because of a combination of . . . characteristics or circumstances" that are not ordinarily relevant to a guidelines departure, an extraordinary case might differ "significantly from the heartland cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case." *DeBeir*, 186 F.3d at 566 (internal quotation marks omitted).

If the grounds that the district court relies upon for departure are not covered by the Guidelines, "certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline" before the district court may depart. *Koon*, 518 U.S. at 98. Therefore, "the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing." *Id.* The district court must determine, largely by comparison with the facts of other Guidelines cases, "[w]hether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way." *Id.*

Stitt presented nineteen mitigating factors to the jury.[13] A substantial amount of testimony was admitted which the district court might have considered as grounds for departure. For example, among the mitigating factors found by at least one of the jurors as to each count were the following:

---

[13]The record would not necessarily have been the same on appeal had the jury not recommended, and the district court imposed, a sentence of death. Other information relevant to Stitt's sentence presumably could have been presented to the district court prior to final sentencing in the event that the jury declined to recommend death. 21 U.S.C.A. §§ 848(e), (p).

-The victims consented to the criminal conduct that resulted in their deaths.

-The other factors in the defendant's background or character mitigate against the imposition of the death sentence.

-Richard Thomas Stitt was subjected to a dysfunctional family setting in childhood.

-Richard Thomas Stitt was abandoned and neglected as a child.

-Richard Thomas Stitt was deprived of the parental guidance and protection which was needed as a child.

-There are factors in Richard Thomas Stitt's background which demonstrate that mercy should be considered.

(Appendix C.) In addition, the jury found, as to counts five and seven, that Stitt "was under unusual and substantial duress regardless of whether the duress was of such a degree as to constitute a defense to the charge" and that Stitt "committed the offense under severe mental or emotional disturbance." (Appendix C.)

Even if we assume, without deciding, that none of the grounds for departure listed in U.S.S.G. ch. 5, pt. K were present in this case, it was not a legal certainty at the time of sentencing that the district court could not have departed based upon a "ground[] for departure . . . not mentioned" in the Guidelines, U.S.S.G. ch. 1, pt. A, intro. comment 4(b), at 7, or "a combination of . . . characteristics or circumstances, differ[ing] significantly from the heartland cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case." *DeBeir*, 186 F.3d at 566 (citing U.S.S.G. § 5K2.0, comment.); *Flores*, 63 F.3d at 1368 (holding, in the context of a death sentence under § 848, that even if the appellant "did not fall within an express departure category, the court would not have been legally barred from finding a different, legitimate reason to reduce his sentence" under § 5K2.0 and, therefore, a

*Simmons* instruction was not required). Thus, this is a situation distinct from that of the "purely ministerial act" discussed in *Ramdass*. *Ramdass*, 530 U.S. at 180 (O'Connor, J., concurring). Here, the district court retained discretion to impose a sentence other than life, even if it was unlikely that discretion would have been exercised. As the plurality noted in *Ramdass*, if the inquiry "include[s] whether a defendant will, at some point, be released from prison" a virtual Pandora's box of possibilities is opened. *Ramdass*, 530 U.S. at 169. For example, the Supreme Court noted that "even the age or health of a prisoner facing a long period of incarceration would seem relevant." *Id.* Likewise, if this Court attempts to determine whether a district court could have departed had the jury not recommended and the district court not imposed a sentence of death, another Pandora's box of possibilities will be opened. *See id.* at 181 ("*Simmons* does not require courts to estimate the likelihood of future contingencies concerning the defendant's parole ineligibility.") (O'Connor, J., concurring). Therefore, we decline to adopt a "functional approach"[14] that would require us to determine whether hypothetical grounds for departure — a factual inquiry best performed in the first instance by the district court — were present in this case. *Id.* at 2121. Such a project would require us to survey the record for the first time on appeal in order to test the factual basis for various possible departures not actually urged on the district court by the parties. Instead, we hold that it was not a legal certainty that Stitt would have received life without parole had he not been sentenced to death because both the relevant statutory and guidelines provisions gave the district court discretion to impose a sentence other than life without parole. In sum, "*Simmons* applies only to instances where, as a legal matter, there is no possibility of parole if the jury decides the appropriate sentence is life in prison," *Ramdass*, 530 U.S. at 169, and to those cases "[w]here all that stands between a defendant and parole ineligibility . . . is a purely ministerial

---

[14]As previously mentioned, the Supreme Court in *Ramdass* refused to accept Ramdass's invitation to adopt a "functional approach" under which a court would have to ignore the legal rules dictating when a defendant is parole ineligible under state law and instead focus on whether, as a practical matter, the defendant will ever be eligible for parole. *Ramdass v. Angelone*, 530 U.S. 156, 169 (2000). The Court observed that such an "extension of *Simmons*" was neither "necessary [n]or workable." *Id.*

act." *Id.* at 180 (O'Connor, J., concurring).[15] Because neither of these scenarios exists, we hold that the district court was not constitutionally required to give a jury instruction and mitigating factor unequivocally informing the jury that Stitt would be sentenced to life in prison without the possibility of parole if not sentenced to death.[16]

## V. *THE CONFUSING JURY INSTRUCTIONS*

Stitt next argues that the district court committed reversible error by giving confusing instructions to the jury. (Appellant's Br. 26-29.) In its instructions to the jury, for example, the district court gave the following instruction:

> At the end of your deliberations, if you unanimously recommend that a sentence of death shall be imposed, then the court is required to sentence the defendant to death. However, if you do not unanimously recommend that a sentence of death shall be imposed, then the court is required to impose a sentence other than death, authorized by law,

[15]*Shafer v. South Carolina*, 121 S.Ct. 1263, 1265 (2001), essentially restates the Court's holdings in *Simmons* and *Ramdass*. In *Shafer*, the Court considered whether a *Simmons* instruction was required under a South Carolina sentencing scheme that requires a defendant to be sentenced to either life in prison without parole or death, if the jury so recommends, if a statutory aggravating factor is found by the jury. *Id.* at 1267. The Court held that "whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new sentencing scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole." *Id.* at 1273. Thus, in *Shafer*, unlike this case, the trial court was left with no discretion whatsoever to impose a sentence other than life in prison without parole or death if the jury found an aggravating factor. As explained above, the Guidelines give the district court discretion in sentencing in marked contrast to the South Carolina statute at issue in *Shafer*.

[16]Whether a *Simmons* instruction is required in a particular case is determined by looking at the particular characteristics of the sentencing scheme at issue. *See supra* n.10. Our holding in this case is limited to sentences of death imposed under 21 U.S.C.A. § 848, and we express no opinion on whether a *Simmons* instruction is required under other federal statutes or state statutory schemes authorizing the death penalty.

which for the defendant Richard Thomas Stitt must be man-
datory life imprisonment without the possibility of parole or
release. In deciding what recommendation to make, you are
not to speculate about the particular sentence the defendant
might receive in the event you do not recommend the death
sentence. That is a matter for the court to decide.

(J.A. at 719.)[17] Stitt contends that the last two sentences of this
instruction negated the first three, thereby potentially confusing the
jurors. (Stitt's Br. 28.)[18] Moreover, the district court also instructed
the jury that "[i]t again becomes my duty, therefore, to instruct you
on the rules of law that you must follow and apply in arriving at your
decision as to the very serious question of whether or not Richard
Thomas Stitt should be sentenced to death or life without parole."
(J.A. at 679.) Similarly, the district court elsewhere in its instructions
stated that "the law leaves it to you, the jury, to decide in your sole
discretion whether the defendant should be sentenced to death or life
without parole." (J.A. at 684.) We agree with Stitt that these instruc-
tions could have potentially confused the jurors.

While Stitt objected to other aspects of the jury instructions at trial,
he did not object that the jury instructions as given were confusing.
"The scope of our review is shaped by whether petitioner properly
raised and preserved an objection to the instructions at trial." *Jones
v. United States*, 527 U.S. 373, 387 (1999). "No party may assign as

---

[17]We note that this is not a *Simmons* instruction because a *Simmons*
instruction must be unambiguous. *See Simmons v. South Carolina*, 512
U.S. 154, 161 (1994) (plurality opinion) (requiring the instruction to be
clear so as not to mislead the jury).

[18]The district court also read to the jury the following non-statutory
mitigating factor: "(1) Should the jury so direct, Richard Thomas Stitt
shall be sentenced to life in prison without any possibility of release if
he is not executed." (J.A. at 714.) As the Government pointed out to the
district court in an objection, the jury did not have control over Stitt's
sentence if they did not agree on the death penalty. To correct its error,
the district court changed the mitigating statement on the "Special Ver-
dict Form" to read "Richard Thomas Stitt may be sentenced to life in
prison without any possibility of release if he is not executed." (J.A. at
752, 771, 791, 727-28.)

error any portion of the [jury] charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection." Fed. R. Crim. P. 30; *see also Jones*, 527 U.S. at 387 (same). "While Rule 30 could be read literally to bar any review of [Stitt's] claim of error, [the Supreme Court's] decisions instead have held that an appellate court may conduct a limited review for plain error." *Jones*, 527 U.S. at 388.

As discussed earlier, under plain error "relief is not warranted unless there has been (1) error, (2) that is plain, and (3) affects substantial rights." *Id.* "[W]e exercise our power under Rule 52(b) sparingly" and will exercise our "discretion to correct plain error only if it 'seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings.'" *Id.* (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). The proper standard for reviewing claims such as this where it is argued "that allegedly ambiguous instructions caused jury confusion" is "whether there is a reasonable likelihood that the jury has applied the challenged instructions in a way that violates the Constitution." *Jones*, 527 U.S. at 390 (internal citations and quotation marks omitted).

Assuming that the district court erred in giving the instructions, it erred by giving Stitt a more beneficial instruction than was required by law. Instead of merely stating that if Stitt were not sentenced to death, he *may* be sentenced to life in prison without parole, the district court at times indicated that Stitt *would* be sentenced to life in prison without parole. For example, the jury could have erroneously believed that Stitt automatically would be sentenced to life without parole if it did not recommend death, or it correctly could have believed that Stitt's sentence would be left to the discretion of the district court. If the jury erroneously believed that Stitt would be sentenced to life without parole if they did not recommend death, Stitt would receive the benefit of the *Simmons* instruction he now seeks. If the jury believed that Stitt's sentence would be left to the discretion of the district court, the jury understood the law correctly. As a result, there is no reasonable likelihood that the jury "applied the challenged instruction in a way that violates the Constitution." *Jones*, 527 U.S. at 390 (internal citations and quotations omitted). Therefore, even if we were to assume that the district court erred in giving the challenged instruc-

tions, that error would not be reversible because it could neither affect Stitt's substantial rights nor seriously affect the integrity, fairness, or public reputation of judicial proceedings. *See Olano*, 507 U.S. at 732.

## VI. *THE VICTIM IMPACT TESTIMONY*

Stitt next argues that the Government improperly introduced victim impact testimony, which Stitt claims was a non-statutory aggravating factor, at the penalty phase hearing without prior written notice as required by 21 U.S.C.A. § 848(h)(1)(B) (West 2000). In particular, Stitt complains that after he introduced mitigating evidence concerning his disadvantaged upbringing, his positive personal traits, and his important role in the life of his young son, the Government introduced victim impact testimony over Stitt's objection. Stitt argues that the introduction of the victim impact testimony violated § 848's requirement that written notice be given before aggravating factors are introduced. The Government argues that it introduced the victim impact testimony, not as an aggravating factor, but as rebuttal evidence for which notice is not required by § 848.

### A.

Stitt's mitigating evidence, introduced pursuant to 21 U.S.C.A. § 848(m), included testimony from Marika Stitt, his aunt; Laticia Ward, the mother of his five year-old son; and Dr. Thomas Pasquale, Stitt's mental health expert. Marika Stitt testified about her nephew's disadvantaged upbringing and some of the positive character traits that she found him to possess. She testified that Stitt lived with her when he was approximately sixteen to eighteen years old. During that time Marika Stitt testified that Stitt attended church and helped her raise her daughter, clean, and cook. Laticia Ward testified that Stitt was a loving father who cared for his son. Ward further testified that Stitt's execution would "affect [their] son tremendously." (TDP[19] at 710.) Dr. Pasquale testified that Stitt's "family origin disfunction" significantly contributed to his past antisocial behavior. (TDP at 62.) Dr. Pasquale also testified that there was a low probability that Stitt would be dangerous while incarcerated in a maximum security penitentiary.

---

[19]Transcript of the death penalty phase of the trial.

After Stitt introduced this mitigating evidence, the Government sought to introduce victim impact testimony to rebut the mitigating evidence. The mothers of two of Stitt's victims testified about the impact of their sons's deaths on their families. One of the mothers testified that her son's grandfather and grandmother both had heart attacks as a result of the emotional impact of their grandson's death and that the murder severely affected her, her husband, and her remaining children. The other mother testified about the traumatic emotional impact her son's death had on the murdered man's handicapped brother and infant son. The Government argues that the district court's admission of the victim impact testimony was proper because the victim impact testimony "specifically rebutted the testimony of Marika Stitt, Laticia Ward and Dr. Thomas Pasquale." (Appellee's Br. at 62.) Specifically, the Government asserts that "[t]he testimony of [the victims' mothers] served as evidence of the specific harm caused by Stitt and showed their sons' uniqueness as individual human beings." (Appellee's Br. at 63.)

## B.

Rulings related to admission and exclusion of evidence are addressed to the sound discretion of the trial judge and will not be reversed absent an abuse of that discretion. *United States v. Lancaster*, 96 F.3d 734, 744 (4th Cir. 1996) (en banc). Nevertheless, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 100 (1996).

Section 848(j) states that

> in the sentencing hearing, information may be presented as to matters relating to any of the aggravating or mitigating factors set forth in subsections (m) and (n) of this section, or any other mitigating factor or any other aggravating factor *for which notice has been provided* under subsection (h)(1)(B) of this section.

(emphasis added). Section § 848(m) sets out the mitigating factors that the finder of fact shall consider "[i]n determining whether a sentence of death is to be imposed on a defendant." 21 U.S.C.A. § 848(m). The consideration of statutory aggravating factors is gov-

erned by 21 U.S.C.A. § 848(n). Congress crafted the statutory scheme to limit the introduction of aggravating factors to those aggravating factors listed in § 848(n) "unless notice of additional aggravating factors is provided under subsection (h)(1)(B) of this section." 21 U.S.C.A. § 848(n). Victim impact testimony is not listed as a statutory aggravating factor, and the Government, in this case, did not provide the notice required to introduce it as a non-statutory aggravating factor. Moreover, the district court expressly noted and instructed the jury that the victim impact testimony was not admitted as an aggravating factor. As a result, we must determine whether the victim impact testimony was otherwise admissible at the penalty phase hearing and, if not, whether its admission was reversible error.

In addition to aggravating and mitigating factors, § 848(j) provides that

> [a]ny other information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing the admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.

21 U.S.C.A. § 848(j). Additionally, "[t]he Government and the defendant shall be permitted to rebut any information received at the hearing and shall be given fair opportunity to present argument as to the adequacy of the information to establish the existence of any of the aggravating or mitigating factors and as to the appropriateness" of the imposition of a death sentence. *Id.*

The Government argues that the victim impact testimony was admissible at the sentencing hearing as rebuttal testimony. Both the definition of rebuttal evidence and the precedent in this Circuit make clear that, when otherwise inadmissible,[20] rebuttal evidence must be

---

[20]We note that to be admissible as direct testimony, information presented at the sentencing hearing must be relevant to an aggravating factor introduced by the Government or a mitigating factor introduced by the

reasonably tailored to the evidence it seeks to refute. Rebuttal evidence is defined as "[e]vidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party. That which tends to explain or contradict or disprove evidence offered by the adverse party." Black's Law Dictionary 1267 (6th ed. 1990). Although the Federal Rules of Evidence do not apply to penalty phase hearings under § 848, cases interpreting the proper scope of rebuttal are instructive by analogy. *Cf. United States v. Chandler*, 996 F.2d 1073, 1090 (11th Cir. 1993) ("Although the Federal Rules of Evidence do not govern the admissibility of evidence during a Section 848(e) sentencing hearing it is helpful to refer to the definition of relevant evidence from the Federal Rules."). For example, in *United States v. Curry*, 512 F.2d 1299 (4th Cir. 1975), we held that there must be a nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut. *See id.* at 1305 ("Where the prosecution seeks through its own rebuttal witnesses to challenge the defendant's evidence of his own good general reputation it is limited to showing his bad general reputation.").

Therefore, the ordinary meaning of "rebuttal" makes clear that any victim impact testimony admitted in rebuttal under § 848 must be reasonably tailored to the information the victim impact testimony is intended to rebut. The Government does not point to, nor can we find, any victim impact testimony that contradicts Stitt's mitigating evidence. In fact, the district court noted

> I don't consider this testimony that you wish to offer about the impact upon the victim's family to be direct rebuttal . . . . The court would understand it as being direct rebuttal if you were saying I am calling a witness to show that that is absolutely false about Mr. Stitt's relationship with his son and his role as a father. That would be directly rebuttal, but this is not directly rebuttal. This is another form of the gov-

---

defendant. 21 U.S.C.A. § 848(j). We have carefully reviewed the statutory aggravating factors (Appendix A), the non-statutory aggravating factors (Appendix B), and the mitigating factors (Appendix C) presented and conclude that the victim impact evidence was not probative of any of the aggravating or mitigating factors.

ernment saying, well, if you can talk about victims, I can
talk about victims.

(J.A. 619-20.)[21] The victim impact testimony did not have "any ten-
dency to make the existence of a material fact [introduced as mitigat-
ing evidence] more probable or less probable than it would" have
been without the testimony. Fed. R. Evid. 401; *see also Chandler*, 996
F.2d at 1090-91 (looking to the Federal Rules of Evidence to define
"relevant" as used in § 848(j)). Therefore, we hold that the victim
impact testimony admitted by the district court was not relevant to
any aggravating or mitigating factor properly introduced at sentencing
as required by § 848(j) and, as a result, the district court abused its
discretion in admitting the victim impact testimony.

---

[21]Although the district court first indicated that it was not inclined to
admit the victim impact testimony, it later changed its position based
upon its reading of *Dawson v. Delaware*, 503 U.S. 159 (1992), and
*Payne v. Tennessee*, 501 U.S. 808 (1991). After reading theses cases, the
district court noted that "[victim impact evidence can be used to rebut
mitigating evidence, and I don't know that it has to be mitigating evi-
dence of a precise nature that was raised here by the defense, but victim
impact testimony certainly can be used." (J.A. 624.) Initially, we note
that while *Payne* held that the introduction of victim impact testimony
is *not constitutionally barred*, *Payne* does not address when the admis-
sion of victim impact testimony is proper under 21 U.S.C.A. § 848. The
district court's analysis failed to take into account the statutory scheme
of § 848, which allows information relevant to any of the aggravating or
mitigating factors to be presented at the sentencing hearing. As explained
above, the victim impact testimony was not relevant to any of the aggra-
vating or mitigating factors presented and, therefore, was inadmissible.
The victim impact evidence would, of course, have been admissible had
the Government provided notice as required by 21 U.S.C.A.
§ 848(h)(1)(B).

In *Dawson*, the Supreme Court addressed whether the Government
could introduce, as rebuttal to the defendant's good character evidence,
evidence of the defendant's membership in "a white racist prison gang"
known as the Aryan Brotherhood. *Dawson*, 503 U.S. at 165. The
Supreme Court held that the defendant's affiliation with the Aryan
Brotherhood was not proper rebuttal evidence because it was not relevant
to the defendant's good character evidence. *Dawson*, 503 U.S. at 165.
Thus, to the extent applicable, *Dawson* supports our holding.

## C.

Having determined that the district court abused its discretion in admitting the victim impact testimony, we now must address whether the district court's error was harmless. Because the victim impact testimony was improperly admitted, we must "ask what the record indicates the jury would have done" had the victim impact testimony not been admitted. *United States v. Tipton*, 90 F.3d 861, 900 (4th Cir. 1996); *see also Jones v. United States*, 527 U.S. 373, 402 (1999) (recognizing that an appellate court, when conducting a harmless-error review of a death sentence, "may choose to consider whether . . . the jury would have reached the same verdict" had the district court not erred).

After carefully reviewing the record, we have no trouble concluding that the improper admission of the victim impact testimony was harmless error. The victim impact testimony in this case was relatively unemotional, brief (19 transcript pages), and comprised only a fraction of the total testimony heard during the penalty phase (1082 transcript pages spanning 8 days). Absent the victim impact testimony, we "have no doubt that the jury would have reached the same conclusion" and would have imposed the death penalty. *Jones*, 527 U.S. at 404-05. For each of the three murders during a CCE for which Stitt was charged, the jury found all of the statutory aggravating factors (Appendix A), and forty of the forty-six non-statutory aggravating factors (Appendix B), with which it was presented. Among the non-statutory aggravating factors found by the jury beyond a reasonable doubt were assault on a uniformed police officer, threatening to kill several deputy sheriffs and a uniformed police officer, participation in forcible home invasions, participation in a non-charged intentional killing to settle a drug related dispute, and ordering co-defendants to shoot a bouncer at a night club.

By contrast, the mitigating factors found by the jury (Appendix C) are unremarkable. Among other things, the mitigating factors found by at least one member of the jury showed that Stitt was youthful, although not a juvenile, at the time the murders were committed; that the victims consented to the criminal conduct that resulted in their deaths; that factors in Stitt's background or character mitigated against the imposition of the death penalty; that Stitt might have been

sentenced to life in prison if he was not sentenced to death; that Stitt would likely be well-behaved and pose no further danger to society while in prison; that Stitt's son will be harmed by the emotional impact of Stitt's execution; and, as to two of the murders, that Stitt was under "unusual and substantial duress" at the time of the murders. Considered against the overwhelming force of the aggravating factors found by the jury which showed the violent and predatory nature of Stitt's character and activities, it is clear beyond a reasonable doubt that the jury would have imposed the death penalty had the victim impact testimony not been improperly admitted.

Moreover, the jurors were instructed that the law prohibited the consideration of any aggravating factors other than those cited by the Government and included in the jury's verdict form. The district court instructed the jury that it could "not consider the effect of the murders on the victims' families [as an aggravating factor]. It is simply not a cited aggravating factor." (J.A. at 709.) During three days of deliberations, the jury never asked the district court to clarify or further explain this instruction. *Cf. Shafer v. South Carolina*, 121 S.Ct. 1263, 1273 (2001) (noting that the sentencing jury "sought further instruction"). We presume that jurors have followed the district court's limiting instructions. *See United States v. Francisco*, 35 F.3d 116, 120 (4th Cir. 1994). Therefore, we hold that the district court's error in admitting the victim impact testimony in rebuttal "was harmless beyond a reasonable doubt." *Jones*, 527 U.S. at 404; *Tipton*, 90 F.3d at 901 (finding the district court's error in improperly instructing the jury as to § 848(n)(1) aggravating factors to be harmless "beyond a reasonable doubt").

In reaching this conclusion, we note that our decision complies with the statutory requirement set forth in 21 U.S.C.A. § 848(q)(3) which states that

> [t]he court shall affirm the sentence if it determines that —
>
>> (A) the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor; and
>>
>> (B) the information supports the special finding of the existence of every aggravating factor upon

which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section.

21 U.S.C.A. § 848(q)(3). Here, for the reasons discussed above, we have concluded that the sentence of death was not imposed on account of the improperly admitted victim impact testimony nor is there any suggestion that it was "imposed under the influence of passion, prejudice, or any other arbitrary factor." *Id.* Furthermore, Stitt does not argue, nor has our review of the record disclosed, any concern as to whether "the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section." *Id.* Therefore, even though we conclude that the district court erred in admitting the victim impact testimony, "we further conclude, as we properly may in appellate review, that the error was harmless beyond a reasonable doubt." *Tipton*, 90 F.3d at 899 (internal citation and quotation marks omitted) (finding an erroneous jury instruction given during the penalty phase of a capital murder trial under § 848 to be harmless beyond a reasonable doubt).

## VII. *THE BENEFITS TO COOPERATING WITNESSES*

Finally, Stitt argues that "[t]he government violates the plain meaning of 18 U.S.C.A. § 201(c)(2) when it promises something of value in exchange for testimony." (Appellant's Br. at 47.) Specifically, Stitt first argues that the Government violated § 201(c)(2) by promising sentencing benefits to cooperating witnesses. For example, in some instances the Government agreed to drop charges against a defendant if the defendant would plead guilty to another specified charge or charges and "cooperate fully and truthfully with the United States, and provide all information known [to him] regarding any criminal activity." (J.A. at 801.) Such cooperation included testifying against Stitt. We have addressed this issue in *United States v. Richardson*, 195 F.3d 192 (4th Cir. 1999). In *Richardson*, we joined "the unanimous conclusion of circuit courts that have ruled over the past year that the government does not violate § 201(c)(2) by granting immunity or leniency or entering into plea agreements to obtain testimony." *Id.* at 197. Thus, Stitt's argument is foreclosed by Circuit precedent.

Stitt next argues that the Government violated § 201(c)(2) when the Federal Bureau of Investigation paid a witness $3,142 in moving expenses so that she could relocate away from Raleigh, North Carolina, because she feared that her role as a cooperating witness jeopardized her safety and that of her children. This issue, too, has been settled in this Circuit. In *United States v. Anty*, 203 F.3d 305 (4th Cir. 2000), we held that "18 U.S.C. § 201(c)(2) does not prohibit the United States from acting in accordance with long-standing practice and statutory authority to pay fees, expenses, and rewards to informants even when the payment is solely for testimony, so long as the payment is not for or because of any corruption of the truth of testimony." *Id.* at 311. Stitt does not suggest any corrupt motive or purpose on the part of the F.B.I. in paying the witness's moving expense. Accordingly, we find no violation of § 201(c)(2).

## VIII.

In sum, we affirm Stitt's convictions and sentences.

*AFFIRMED*

## APPENDIX A

The statutory aggravating factors unanimously found by the jurors in this case were as follows:

COUNT THREE — KILLING OF JAMES M. GRIFFIN

I. *CATEGORY ONE STATUTORY AGGRAVATING FACTORS*

* * *

1. RICHARD THOMAS STITT intentionally killed James M. Griffin.

2. RICHARD THOMAS STITT intentionally inflicted serious bodily injury which resulted in the death of James M. Griffin.

3. RICHARD THOMAS STITT intentionally engaged in conduct intending that the victim, James M. Griffin, be killed and that lethal force be employed against the victim, which resulted in the death of James M. Griffin.

* * *

II. *CATEGORY TWO STATUTORY AGGRAVATING FACTORS*

* * *

1. RICHARD THOMAS STITT committed the offense described in Count Three of the Superseding Indictment after substantial planning and premeditation.

2. RICHARD THOMAS STITT committed the offense described in Count Three of the Superseding Indictment in relation to a violation of Title 21, United States Code, Section 859, that is distributing controlled substances to persons under 21 years of age.

3. In committing the offense described in Count Three of the Superseding Indictment and in escaping apprehension for the violation of the offense, RICHARD THOMAS STITT knowingly created a grave risk of death to another person in addition to the victim, James M. Griffin.

(J.A. at 740-41.)

COUNT FIVE-KILLING OF SINCLAIR SIMON, JR

I. *CATEGORY ONE STATUTORY AGGRAVATING FACTORS*

* * *

RICHARD THOMAS STITT intentionally engaged in conduct intending that Sinclair Simon, Jr. be killed and/or that lethal force be employed against Sinclair Simon, Jr., which resulted in the death of Sinclair Simon, Jr.

* * *

II. *CATEGORY TWO STATUTORY AGGRAVATING FACTORS*

* * *

1. RICHARD THOMAS STITT procured the killing of Sinclair Simon, Jr., by payment or promise of payment, of anything of pecuniary value.

2. RICHARD THOMAS STITT committed the offense described in Count Five of the Superseding Indictment after substantial planning and premeditation.

3. RICHARD THOMAS STITT committed the offense described in Count Five of the Superseding Indictment in relation to a violation of Title 21, United States Code, Section 859, that is, distributing controlled substances to persons under 21 years of age.

(J.A. at 755-56.)

COUNT SEVEN — KILLING OF JAMES E. GILLIAM, JR.

I. *CATEGORY ONE STATUTORY AGGRAVATING FACTORS*

* * *

RICHARD THOMAS STITT intentionally engaged in conduct intending that James E. Gilliam, Jr. be killed and that lethal force be employed against the victim, which resulted in the death of James E. Gilliam, Jr.

* * *

II. CATEGORY TWO STATUTORY AGGRAVATING FACTORS

* * *

1. RICHARD THOMAS STITT procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

2. RICHARD THOMAS STITT committed the offense described in Count Seven of the Superseding Indictment after substantial planning and premeditation.

3. RICHARD THOMAS STITT committed the offense described in Count Seven of the Superseding Indictment in relation to a violation of Title 21, United States Code, Section 859, that is, distributing controlled substances to persons under 21 years of age.

(J.A. at 774-75.)

APPENDIX B

Under § 848(h)(1)(B) the Government may also seek to prove aggravating factors other than those listed in § 848(n) as a basis for the death penalty. These aggravating factors will be referred to as non-statutory aggravating factors. Forty-six non-statutory aggravating factors were given to the jury for each of the three murders during a CCE. Although the first non-statutory aggravating factor changed for each murder as indicated below based upon the identity of the victim, the other factors were constant for each murder count. The non-statutory aggravating factors unanimously found by the jury were:

1. RICHARD THOMAS STITT participated in intentionally killing two persons other than James M. Griffin in violation of the statute, to wit: Sinclair Simon, Jr. and James E. Gilliam, Jr.

RICHARD THOMAS STITT participated in intentionally killing two persons other than Sinclair Simon, Jr. in violation of the statute, to wit: James M. Griffin and James E. Gilliam, Jr.

RICHARD THOMAS STITT participated in intentionally killing two persons other than James E. Gilliam, Jr. in violation of the statute, to wit: James M. Griffin and Sinclair Simon, Jr.

2. On or about July 1, 1986, in Portsmouth, Virginia, RICHARD THOMAS STITT was adjudicated delinquent for receiving stolen property and placed on 12 months suspended commitment subject to his completion of Portsmouth Boys Group Home Program.

3. On or about October 28, 1986, in Portsmouth, Virginia, RICHARD THOMAS STITT was formally accepted in the Portsmouth Boys Group Home Program. Stitt was terminated from the program on or about November 4, 1986, for a petit larceny arrest.

4. On or about December 10, 1986, in Portsmouth, Virginia, RICHARD THOMAS STITT was committed to the Virginia State Board of Corrections following juvenile delinquency adjudications for petit larceny and unauthorized use of a motor vehicle. On or about August 5, 1987, RICHARD THOMAS STITT was released from the custody of the Virginia State Board of Corrections.

5. In or about November 1987, in Portsmouth, Virginia, RICHARD THOMAS STITT, while on supervised probation committed several robberies while armed with a deadly weapon.

6. On or about December 7, 1987, in Portsmouth, Virginia, RICHARD THOMAS STITT was committed to the Virginia State Board of Corrections following a juvenile delinquency adjudication for robbery by force and having been found in violation of juvenile probation or aftercare. On or about June 17, 1988, RICHARD THOMAS STITT was released from the custody of the Virginia State Board of Corrections.

7. On or about August 3, 1988, in Chesapeake, Virginia, RICHARD THOMAS STITT, while on supervised probation, was arrested for unauthorized use of a motor vehicle. On or about September 3, 1988, a judge in the Juvenile and Domestic Relations Court transferred the case to the Circuit Court and ordered that STITT be tried as an adult. On or about October 31, 1988, RICHARD THOMAS STITT was found guilty of the felony offense of unauthorized use of a motor vehicle and sentenced as an adult.

8. On or about March 3, 1989, in Portsmouth, Virginia, RICHARD THOMAS STITT, while on supervised probation for a previous felony conviction, was arrested for possession with intent to distribute cocaine. A judge in the Juvenile and Domestic Relations Court transferred the case to the Circuit Court and ordered that STITT be tried again as an adult. On or about October 20, 1989, RICHARD THOMAS STITT was found guilty of the felony offense of possession of cocaine and sentenced as an adult.

9. In or about April 1993, in Raleigh, North Carolina, RICHARD THOMAS STITT was found guilty of carrying a concealed weapon, that is, a firearm.

11. In or about late 1993, in Virginia Beach, Virginia, RICHARD THOMAS STITT was found guilty of carrying a concealed weapon, that is, a firearm.

12. In or about October 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT was found guilty of assaulting a uniformed Portsmouth Police Officer.

13. In or about August 1996, in Portsmouth, Virginia, RICHARD THOMAS STITT was found guilty of trespassing in an incident where he threatened to "smoke" (kill) several Portsmouth Deputy Sheriffs.

14. RICHARD THOMAS STITT used firearms, encouraged his coconspirators to use and carry firearms, and often provided them with firearms.

15. RICHARD THOMAS STITT and his coconspirators Kermit Brown, a/k/a "Bear," Jason Ortega, Marcus Reid, and others, planned and participated in several home invasions, wherein they, armed with firearms, forcibly entered the homes of other individuals and stole money, drugs and other valuables.

17. In or about Summer 1992, in Portsmouth, Virginia, RICHARD THOMAS STITT shot at an individual known as "Roger Rabbit" who owed a drug debt.

18. In or about 1991, in Portsmouth, Virginia, RICHARD THOMAS STITT planned to collect a drug debt from an individual known as "Shoe Fly," and directed codefendant Kermit Brown and another individual, both armed with handguns, to hide outside of "Shoe Fly's" residence and wait for him to arrive.

19. In or about late 1993, RICHARD THOMAS STITT displayed a lack of remorse for the killing of James M. Griffin by joking that he "did" that murder.

20. In or about early 1994, in Winston-Salem, North Carolina, RICHARD THOMAS STITT, suspecting that a coconspirator had stolen drug proceeds belonging to him, sent a codefendant to kill the coconspirator in retribution.

21. In or about Spring 1994, in Portsmouth, Virginia, RICHARD THOMAS STITT invaded the apartment of a female friend located at 72 Dale Drive, and in the presence of the woman's young daughter, accused the woman of seeing another man and threatened to physically harm her.

22. On or about June 3, 1994, in Portsmouth, Virginia, RICHARD THOMAS STITT participated in the intentional killing of Andre Holley, a/k/a "Tank," to avenge a drug-related dispute.

23. In or about September 1994, in Portsmouth, Virginia, RICHARD THOMAS STITT dispatched Marcus Reid and "Red Boy" to the London Oaks housing area to physically assault Calton Faulcon because of a dispute.

24. In or about October 1994, RICHARD THOMAS STITT traveled to Raleigh, North Carolina, where he brandished a firearm at codefendant Marcus Reid and threatened to kill him because of a drug related dispute.

26. In or about November 1994, in Portsmouth, Virginia, RICHARD THOMAS STITT, in the company of his enforcer Jason A. Davis, obstructed justice by attempting to intimidate a female acquaintance who had provided information to the Suffolk Police Department about the homicide of Sinclair Simon, Jr.

27. In or about February 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT brandished a firearm at an individual while gambling at a local barber shop.

28. On or about March 9, 1995, in Newport News, Virginia, RICHARD THOMAS STITT told Suffolk Police Department, Detectives E.C. Harris and Jeff Bangley, who were investigating the murder of Sinclair Simon, Jr., that if he had his "Tech" firearm with him, he would "take them out."

30. In or about Summer 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT brandished his handgun and attempted to pistol-whip an individual while gambling at the Majik City nightclub.

31. In or about Summer 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT threatened a coconspirator because of a drug related dispute and stated that he would send one of his enforcers, Jason A. Davis, to cause physical harm to this individual.

33. In or about Summer 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT attempted to hire Ivan L. Harris and Percell Davis to physically assault "Little Mike" over an unpaid drug debt. When Harris and Davis refused, STITT himself assaulted "Little Mike" and demanded that "Little Mike's" mother satisfy the debt.

34. In or about Summer 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT and one of his enforcers, Jason A. Davis, physically assaulted and brandished a firearm at Keith Burks in retaliation for an argument that Burks had with STITT's sister.

35. On or about September 18, 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT threatened to kill John Husted, a uniformed Portsmouth Police Officer, because in the performance of his official duties Husted sprayed STITT with mace for refusing to follow lawful instructions, then chased and arrested him.

36. In or about late 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT in the company of one of his enforcers, Jason A. Davis, threatened Curtis Richardson's girlfriend over a drug debt owed to STITT by Richardson and in retaliation for a drug-related shooting.

37. In or about late 1995, RICHARD THOMAS STITT offered $3,500 to Ivan L. Harris, one of his enforcers, to kill Curtis Richardson because of a crack cocaine debt owed by Richardson. STITT specifically instructed Harris how to carry out and execute the killing.

38. In or about early 1996, in Chesapeake, Virginia, RICHARD THOMAS STITT devised a plan to have one of his enforcers, Jason A. Davis, kill a coconspirator who STITT suspected of cooperating with law enforcement agents.

39. In or about early 1996, in Portsmouth, Virginia, RICHARD THOMAS STITT assaulted a coconspirator with a beer bottle by striking his head on the pavement while threatening to kill him and his mother for failure to pay a drug debt.

40. On or about September 8, 1996, in Portsmouth, Virginia, RICHARD THOMAS STITT ordered the shooting of Samuel Hucks with the intent to kill him.

41. In or about September 1996, in Portsmouth, Virginia, RICHARD THOMAS STITT ordered the murder of Tyrone Wallace, a/k/a "Woo Woo," to prevent Wallace from cooperating with law enforcement agents.

42. On or about December 18, 1996, at the Majik City Club located in Portsmouth, Virginia, RICHARD THOMAS STITT directed his codefendants Jason A. Davis, Percell A. Davis, and Jason Ortega to physically assault and shoot Calvin Graves, a club employee who would not allow STITT to remain on the Club's premises while armed with a handgun. As a result of the shooting, Graves is permanently disabled.

43. In or about December 1997, RICHARD THOMAS STITT dispatched his "enforcer" Jason Ortega to the house of a female friend in Chesapeake, Virginia, to intimidate her and to caution her against seeing other men.

44. In or about January or February 1998, in Portsmouth, Virginia, RICHARD THOMAS STITT offered $3,500 to Ivan L. Harris to kill codefendant Teo L. Smith because he believed that Smith was cooperating with Special Agents of the Federal Bureau of Investigation and providing information about STITT's drug trafficking activities.

46. The defendant RICHARD THOMAS STITT poses a future danger in that he is likely to return to narcotics trafficking and acts of violence, poses a future danger to inmates and correctional officers in an institutional setting in that he is likely to engage in acts of violence against others and he poses a future danger to correctional officers in an institutional setting in that he likely to disregard, disobey, resist, and challenge lawful authority.

The jury failed to find that the Government had established the following non-statutory aggravating factors beyond a reasonable doubt:

10. In or about late 1993, in Virginia Beach, Virginia, RICHARD THOMAS STITT was found guilty of the felony offense of possessing a fraudulent driver's license, resisting arrest, obstruction of justice and another misdemeanor.

16. In or about 1991, in Portsmouth Virginia, RICHARD THOMAS STITT shot at an individual with a firearm.

25. In or about late October 1994, in Portsmouth Virginia, RICHARD THOMAS STITT obstructed justice by threatening to have a coconspirator killed if he provided information to the Suffolk Police Department regarding the investigation of Sinclair Simon, Jr.'s homicide.

29. In or about 1995, in Chesapeake, Virginia, RICHARD THOMAS STITT hid in the apartment of a female friend, ambushed her, and threatened to kill her because he believed she was seeing someone else.

32. In or about Summer 1995, in Portsmouth, Virginia, RICHARD THOMAS STITT, in the company of Jason A. Davis, one of his enforcers, visited a female friend at 72 Dale Drive, removed a knife from the kitchen, heated the knife on the stove, and held the knife to the woman's face while threatening to cut her face so that no other man would ever date her.

45. On or about February 11, 1998, in Miami, Florida, RICHARD THOMAS STITT participated in the murders of Roger Davis and Tyrone Tarver as part of an ongoing dispute between rival drug distribution gangs.

(J.A. at 742-50; 756-69; 776-88.)

## APPENDIX C

The following mitigating factors were found by at least one of the jurors:

[statutory mitigating factors]

## COUNT THREE — KILLING OF JAMES M. GRIFFIN

\* \* \*

5. RICHARD THOMAS STITT was youthful, although not under the age of 18.

8. Another defendant or defendants, equally culpable in the crime, will not be punished by death.

9. The victims consented to the criminal conduct that resulted in their deaths.

10. The other factors in the defendant's background or character mitigate against imposition of the death sentence.

[additional non-statutory mitigating factors]

1. Richard Thomas Stitt may be sentenced to life in prison without any possibility of release if he is not executed.

2. In prison Richard Thomas Stitt is likely to be a well-behaved, productive and cooperative inmate who will pose no further danger to society.

3. Richard Thomas Stitt has responded well to structured environments and would likely make a successful adaptation to prison if he were sentenced to life in prison.

4. Richard Thomas Stitt was subjected to a dysfunctional family setting in childhood.

5. Richard Thomas Stitt was abandoned and neglected as a child.

6. Richard Thomas Stitt was deprived of the parental guidance and protection which was needed as a child.

7. Richard Thomas Stitt's son will be harmed by the emotional trauma of his father's execution.

8. That other factors in Richard Thomas Stitt's background or character weigh against imposition of the death sentence.

9. There are factors in Richard Thomas Stitt's background which demonstrate that mercy should be considered.

(J.A. at 751-53.)

COUNT FIVE — KILLING OF SINCLAIR SIMON, JR

[In addition to the mitigating factors found by the jury in Count Three, the jury found the following additional statutory mitigating factors for Count Five:]

* * *

2. RICHARD THOMAS STITT was under unusual and substantial duress regardless of whether the duress was of such a degree as to constitute a defense to the charge.

* * *

7. RICHARD THOMAS STITT committed the offense under severe mental or emotional disturbance.

(J.A. at 769-73)

COUNT SEVEN — KILLING OF JAMES E. GILLIAM, JR.

[The jury found the same mitigating factors for Count Seven as it did for Count Five.]

(J.A. at 789-92.)